563 So.2d 710 (1990)
James H. QUIRK and Marie Quirk, Husband and Wife, Appellants,
v.
Lynda M. ANTHONY, Queen City Indemnity Company, Travelers Insurance Company, Southern American Insurance Company, and Key Agency, Inc., a Florida Corporation, Appellees.
No. 89-01682.
District Court of Appeal of Florida, Second District.
April 25, 1990.
Rehearing Denied July 6, 1990.
*711 Robert Jackson McGill of Robert Jackson McGill, P.A., Venice, for appellants.
Raymond T. Elligett, Jr., and Brett J. Preston of Shackleford, Farrior, Stallings & Evans, P.A., Tampa, for appellee Travelers Ins. Co.
*712 Love Phipps of Corlett, Killian, Ober, Hardeman, McIntosh & Levi, P.A., Miami, for appellee Southern American Ins. Co.
Robert M. Daisley and Jennifer A. Phelan of Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, for appellee Key Agency, Inc.
ALTENBERND, Judge.
The plaintiffs, Mr. and Mrs. Quirk, appeal final summary judgments which declare that they are not entitled to underinsured motorist coverage under two automobile insurance policies issued to Mr. Quirk's employer, West Coast Excavating. Additionally, they appeal a summary judgment which rules that the Quirks have no claim against Key Agency, Inc., an independent insurance agency which assisted West Coast in obtaining these policies. The trial court concluded that UM coverage had been validly rejected on both policies by the independent insurance agent as an insurance broker for West Coast.
Because there are issues of fact concerning the independent agent's status with Travelers Insurance Company, we reverse the summary judgment concerning the policy of primary insurance issued by Travelers. We affirm the summary judgment concerning the surplus lines umbrella policy issued by Southern American Insurance Company. The undisputed facts establish that Key acted as an insurance broker for that transaction. Since the summary judgment in favor of Key was dependent upon Travelers' summary judgment, we also reverse that judgment.

I. A BRIEF DESCRIPTION OF THE ACCIDENT
On December 24, 1984, Mr. Quirk was involved in a motor vehicle accident in Charlotte County, Florida. At the time of the collision, Mr. Quirk was a passenger in a truck which was owned by his employer, West Coast. The truck was driven by a fellow employee. The accident occurred when Lynda Anthony allegedly pulled her vehicle into the path of the truck at an intersection. Mr. Quirk sustained severe injuries.
At the time of the accident, Ms. Anthony had liability insurance with State Farm Automobile Insurance Company, which provided limits of $10,000 per person. The Quirks had a personal automobile insurance policy with Queen City Indemnity Company, which provided limits of $25,000 per person for UM coverage. These policies are not involved in this appeal.
West Coast had two commercial automobile insurance policies which are the focus of this appeal. Both policies had been obtained through Key. Travelers' policy was a primary policy, and Southern American's policy was an umbrella policy. Neither policy, as issued, provided any UM coverage.

II. THE TRAVELERS INSURANCE POLICY
West Coast first purchased insurance through Key in early 1982.[1] The principal insurance agent at Key was Thomas Dignam. In February 1982, he obtained an automobile liability policy for West Coast through Iowa National Insurance Company. This insurance policy provided no UM coverage. For this policy, Mr. Dignam's file contains at least one rejection of UM coverage which was signed by a corporate officer of West Coast.
In late 1983, Iowa National experienced financial difficulties. On December 21, 1983, Key placed West Coast's coverage with Travelers. When this new coverage was obtained, it is undisputed that Key did not obtain a written rejection from anyone at West Coast. The agency did not sign any rejection form as authorized agent or broker for West Coast. Travelers did not demand a written rejection from anyone on behalf of West Coast before it issued a policy which provided no UM coverage. Although there is evidence from which one could infer that West Coast would not have *713 purchased UM coverage on its excavating business had this issue been presented to it, its corporate officers deny that any decision to reject that coverage was made by them or even discussed with them by Mr. Dignam or anyone at Key.
The record on appeal contains little information concerning the renewal of Travelers' policy on December 21, 1984. It is clear that the policy was renewed and, thus, was in effect at the time of the accident. It is unclear what, if any, information Travelers provided to West Coast with its annual premium notice. § 627.727(1), Fla. Stat. (Supp. 1984).
It is undisputed that Key is an independent insurance agency rather than a captive insurance agency. This means that the agency was not obligated to submit West Coast's request for insurance to any one carrier. It could send the application for insurance to any of the insurance carriers for which it was a licensed agent. See §§ 626.301(2), .331(2), .342, Fla. Stat. (1983). It could also send an application to other carriers for which it held no license. To submit an application to a carrier for whom it held no license, however, Key was required to forward the application through some agent who was licensed by that carrier.
In this case, the exact relationship between Key and Travelers is in doubt. Travelers did not submit affidavits or depositions, other than Mr. Dignam's deposition, to establish its relationship with Key. From the record, it appears probable, although not totally certain, that Key, through Mr. Dignam, was a licensed agency for Travelers. See § 626.094, Fla. Stat. (1983). Likewise, it appears probable that the relationship involved a nonexclusive oral or written agency contract. These are matters which we cannot resolve as a matter of law from this record.
The trial court granted a summary judgment concerning the Travelers insurance policy for two reasons. First, it determined that Mr. Quirk, as an employee and permissive user of the named insured, was merely a class II insured and had no standing to challenge technical defects in his employer's rejection of UM coverage on the commercial automobile policy.[2] The trial court determined that the statutory requirements concerning a written rejection, which applied when the policy was issued in December 1983 and when it was renewed in December 1984, were technical requirements that the Quirks could not contest. Second, the trial court determined that the Quirks could contest whether the rejection was a knowing rejection. On this issue, the trial court determined that Mr. Dignam was an insurance broker for West Coast and that he had made a valid, knowing rejection on behalf of his client.

A. The Quirks Standing to Contest the Absence of a Written 
Rejection.
The relationship between the UM statute and the Florida Legislature is similar to that between a fragile beach and a hurricane, except the annual storm season in the legislature arrives a few months earlier.[3] As a result of the constantly changing contours of this heavily regulated area of insurance law, judges and attorneys need carefully to guard against the possibility of applying the wrong statute or relying upon outdated precedent. This case is a classic example of these problems.
In the 1970s, the UM statute required an insurance carrier to issue a motor vehicle policy containing UM coverage unless "any insured named in the policy *714 shall reject the coverage." § 627.727(1), Fla. Stat. (1975-1979). The courts interpreted this statutory provision to require a "knowing" rejection. Kimbrell v. Great American Ins. Co., 420 So.2d 1086 (Fla. 1982). A written document was not statutorily required to establish a knowing rejection, and the legal issue usually created a question of fact for jury determination. Kimbrell.
In the 1980s, the legislature amended the UM statute on several occasions to create an environment in which UM was still promoted by the state, but a valid rejection of the coverage could be obtained by a carrier without a great risk of litigation concerning the rejection. In 1982, the statute was amended to require that the insured reject the coverage "in writing." § 627.727(1), Fla. Stat. (Supp. 1982) (corresponds to Ch. 82-243, § 544, Laws of Fla.). Effective October 1, 1984, the statute was further amended. After that date, rejections still required a written document, but the content of that document was dictated, in part, by the statute. The form of the rejection required approval from the Insurance Commissioner. The amended statute states: "If this form is signed by a named insured it shall be a conclusive presumption that there was an informed, knowing rejection of coverage... ." § 627.727, Fla. Stat. (Supp. 1984) (corresponds to Ch. 84-41, § 1(1), Laws of Fla.).
Prior to the amendments in 1982 and 1984, this court held that an employee had standing to question whether his employer had made a proper rejection of UM protection. Cullars v. Manatee County, 463 So.2d 484 (Fla. 2d DCA 1985) (date of policy issuance unknown, accident on May 22, 1981). In St. Paul Fire & Marine Insurance Co. v. Smith, 504 So.2d 14 (Fla. 2d DCA), review denied, 511 So.2d 299 (Fla. 1987) (policy initially issued in 1978, accident on April 30, 1981), we held that an employee of the named insured could not complain of the insurer's failure to comply with the annual notice requirement, which was added to the statute in 1980. Following precedent from other districts, we held that the premium notice was a technical requirement rather than a basic requirement of insurance law relating to the existence of UM coverage. See also Federal Ins. Co. v. Norris, 543 So.2d 776 (Fla. 1st DCA 1989) (date of policy issuance and date of accident unknown). On the other hand, we held that a class II insured continued to have standing to object to the insurance carrier's failure to obtain a knowing rejection from the named insured. Smith.
The question now arises whether the statutory requirement of a written rejection is a technical matter which the Quirks cannot contest, or whether it is a basic statutory requirement designed to protect class II insureds, as well as class I insureds. We hold that class II insureds are entitled to challenge an insurance carrier's failure to obtain a written rejection.
There are several reasons for our holding. First, the nature and extent of the 1982 and 1984 amendments make it apparent that the legislature is attempting to avoid litigation over a "knowing" rejection by placing far greater emphasis and importance upon the written rejection as a selfproving document. Second, the written rejection should make the insurance carrier's task much easier. If the underwriting file contains a signed rejection, a policy can be issued without UM. If the insured fails to sign and submit a rejection form, the carrier simply can refuse to issue a policy without UM. Given the relative simplicity of this system, the insurance carrier should not be encouraged by the courts to disregard the written rejection as a technicality. Finally, we would note that this problem frequently arises with corporate insureds. Corporations do not sustain bodily injuries and do not make UM claims. If their corporate agents and employees do not have standing to contest the carrier's failure to obtain a written rejection, no one will ever have standing.
We recognize that this holding may conflict with the rule announced in Gast v. Nationwide Mutual Fire Insurance Co., 516 So.2d 112 (Fla. 5th DCA 1987). In Gast, the Fifth District apparently applied the 1985 statute and held that a similarly situated employee could not challenge the insurance company's failure to obtain a *715 written rejection. In that case, however, the court relied, in part, on precedent which construed the statute prior to the amendments requiring a written rejection. More important, the court was clearly impressed by the parties' stipulation in which they agreed that the employer had made a knowing, oral selection of UM with reduced limits.
Although we hold that a class II insured has standing to raise the issue of a written rejection, this does not mean that the class II insured automatically receives UM coverage in the absence of a written rejection by the named insured. We agree that an insured can waive rights which it receives by regulation or statute. Del Prado v. Liberty Mut. Ins. Co., 400 So.2d 115 (Fla. 4th DCA), review dismissed, 407 So.2d 1105 (Fla. 1981). Thus, once a class II insured establishes that no written rejection exists, the burden of proof shifts to the insurance carrier. Auger v. State Farm Ins. Co., 516 So.2d 1024 (Fla. 2d DCA 1987). The carrier must then prove that the named insured waived the right to a written rejection by otherwise making a knowing rejection.[4] At least in cases involving the 1982-84 statutes, the carrier has the option of proving that the named insured, who did not sign a written rejection, received and ignored a UM advisory which accompanied the notice of premium. Marchesano v. Nationwide Property & Casualty Ins. Co., 506 So.2d 410 (Fla. 1987); see Ch. 87-213, § 1, Laws of Fla. Thus, our holding is not inconsistent with the outcome in Gast.

B. An Independent Insurance Agent's Status as Agent or Broker.
If Mr. Dignam at Key is an insurance broker for West Coast, it is possible that he waived the statutory right of a written rejection and made a knowing rejection for his client. The appellees argue that Mr. Dignam is an independent insurance agent and, thus, as a matter of law, a broker in this case. We do not believe that independent insurance agents necessarily, or even typically, are insurance brokers concerning the specific function of rejecting or selecting UM coverage.
In Auto-Owners Insurance Co. v. Yates, 368 So.2d 634 (Fla. 2d DCA), cert. denied, 378 So.2d 351 (Fla. 1979), this court considered a case in which an independent agent sold commercial, but not personal, automobile insurance. When the agent's customer desired a policy of personal automobile insurance, he obtained an application from another agency and submitted the application through the other agency to the insurance company. Under these circumstances, we held that an independent agent was a broker for the customer and not an agent for the insurer.[5] As that case demonstrates, it is often difficult to decide whether an agent is acting as a broker or an agent. Frequently, the issue is one of fact. See 3 Couch on Insurance § 25.94 (2d rev. ed. 1984).
Under Florida's insurance code, a general lines agent obtains a license that discloses the insurance company that he or she represents. § 626.301(2), Fla. Stat. (1983). If an independent agent wishes to represent numerous insurance carriers, and the insurance carriers consent, the agent can obtain numerous licenses. § 626.331(2), Fla. Stat. (1983). Thus, an agent's licensed insurance companies know that the agent will represent them, and they can monitor the agent's conduct through contracts or otherwise. Concerning the obligation to obtain a proper rejection of UM coverage, we hold that an independent *716 agent is the insurance company's agent, and not the insured's broker, when the relevant insurance company is one of the agent's licensed companies. Cf. Monogram Products, Inc. v. Berkowitz, 392 So.2d 1353 (Fla. 2d DCA 1980) (fire insurer not liable for agent/broker who was not its contractual agent).
This holding is a practical rule from the public's standpoint. If a customer turns to the yellow pages and selects an insurance company, companies with captive agents look like companies with independent agents. The customer is not advised that the risks are different if he or she calls a captive agent licensed to sell coverage for only one carrier, as opposed to an independent agent licensed to sell coverage for several carriers. To make one agent the customer's broker, and the other the carrier's agent, at least for purposes of UM rejection and selection, is illogical and unsupported by any meaningful distinction. Thus, at least for this limited purpose, an agent is not an insurance broker unless the application is sent to an insurance carrier that the agent is not licensed to represent.
We reverse the summary judgment in favor of Travelers. Without discussing the details of the claim against Key, we also reverse its summary judgment because it was entered for reasons which are dependent upon Travelers' judgment.

III. THE SOUTHERN AMERICAN SURPLUS LINES UMBRELLA POLICY
In October 1984, West Coast obtained an umbrella policy through Key. This policy was apparently required for West Coast to qualify as a subcontractor on a large project. The umbrella policy was issued by Southern American as a surplus lines carrier. Surplus lines insurers are unauthorized insurers to which certain Florida insurance risks may be exported under statutorily defined circumstances. §§ 626.913-.937, Fla. Stat. (1983). In order to handle surplus lines coverage, a general lines agent must obtain an additional license. § 626.927, Fla. Stat. (1983). It is undisputed that Mr. Dignam and Key were not licensed for surplus lines. In order to obtain this umbrella policy, Key obtained an application from an authorized surplus lines agent and submitted the application through that agency. Thus, the procedure used for this policy is virtually identical to that in Yates. We agree with the trial court that Key was West Coast's insurance broker concerning the application for the umbrella policy.
The parties to this appeal have argued the issue of whether Southern American obtained a knowing rejection of UM coverage through Mr. Dignam, as an insurance broker. The "knowing rejection" issue is immaterial. Since the policy was issued after October 1, 1984, and it is not a primary insurance policy, Southern American was not obligated to provide UM coverage under the provisions of section 627.727(1), Florida Statutes (Supp. 1984). It merely needed to make such coverage available as a part of the application and "at the written request of the insured." § 627.727(2), Fla. Stat. (Supp. 1984) (corresponds to Ch. 84-41, § 1(2), Laws of Fla.). It is undisputed that Mr. Dignam did not request UM coverage and subsequently filed a written rejection signed by an employee in his office because, as West Coast's broker, he believed West Coast did not desire the coverage. Whether his understanding was correct or incorrect, Southern American did not violate Florida law by issuing the policy which he requested. Accordingly, the summary judgment in favor of Southern American is affirmed.
Affirmed in part, reversed in part, and remanded.
RYDER, A.C.J., and DANAHY, J., concur.
NOTES
[1] There have been several corporate changes involving West Coast Excavating during the relevant period. These changes are not important to this opinion and have been omitted to avoid unnecessary complication.
[2] Case law in this area sometimes describes a person in Mr. Quirk's position as an employee, a permissive user, or an omnibus insured. These terms can confuse issues of liability insurance or master/servant law with the true issues. Mr. Quirk is a lawful occupant of the insured vehicle, but not a member of the insured's family. Persons in this category are most accurately described as second class or class II insureds for purposes of UM coverage. Mullis v. State Farm Mut. Auto. Ins. Co., 252 So.2d 229, 238 (Fla. 1971); Travelers Ins. Co. v. Pac, 337 So.2d 397 (Fla. 2d DCA 1976), cert. denied, 351 So.2d 407 (Fla. 1977).
[3] Since the creation of the UM statute in 1961, it has been affected on twenty-six occasions by legislative enactments. If one includes the closely related anti-stacking statute, section 627.4132, Florida Statutes (1989), another six legislative actions must be counted.
[4] We emphasize that it is the carrier's burden to prove that the named insured made the knowing rejection of UM coverage before the policy was delivered. It is not enough to establish, after a claim, that the named insured would have rejected the UM coverage if it had been explained to the named insured prior to the claim. The decisions to purchase insurance and to underwrite a risk are present decisions concerning future possibilities. In most instances, the law distorts this decision-making process when it permits any party to make a hypothetical decision after the risk has become a reality.
[5] See also Noaker v. Canadian Universal Ins. Co., 468 So.2d 330 (Fla. 2d DCA), review denied, 478 So.2d 54 (Fla. 1985); Empire Fire & Marine Ins. Co. v. Koven, 402 So.2d 1352 (Fla. 4th DCA 1981); Acquesta v. Indus. Fire & Casualty Co., 467 So.2d 284 (Fla. 1985).