574 So.2d 1142 (1991)
L. Carl ADAMS, II, Appellant,
v.
AETNA CASUALTY & SURETY COMPANY, a Foreign Corporation; Standard Fire Insurance Company, a Foreign Corporation, Appellees.
EARL BACON INSURANCE AGENCY, INC., a Florida Corporation, Appellant,
v.
L. Carl ADAMS, II, Appellee.
Nos. 88-19, 88-1104.
District Court of Appeal of Florida, First District.
January 30, 1991.
*1143 Ellen B. Gwynn and Thomas J. Guilday of Huey, Guilday, Kuersteiner & Tucker, P.A., Tallahassee, for L. Carl Adams, II, appellant, in No. 88-19, appellee, in No. 88-1104.
Patricia Guilday of Fuller, Johnson & Farrell, P.A., Tallahassee, for appellant Earl Bacon Ins. Agency, Inc., in No. 88-1104.
Dixon Ross McCloy, Jr., of Sale, Smoak, Harrison, Sale, McCloy & Thompson, Chartered, Panama City, for appellees Aetna Cas. & Sur. Co. and Standard Fire Ins. Co., in No. 88-19.
ZEHMER, Judge.
These cases come to this court from final judgments entered in a single jury trial, and the records have been consolidated for appeal purposes.
In case number 88-19, L. Carl Adams, II (Biff Adams), appeals a final judgment entered on a directed verdict for Aetna Casualty & Surety Company and Standard Fire Insurance Company (referred to collectively *1144 as Aetna).[1] The complaint alleges that Aetna had not obtained a knowing rejection of uninsured/underinsured motorists insurance coverage (UM/UIM) in limits less than the stated bodily injury liability coverage from the named insured, Biff's father Leon Carl Adams (Mr. Adams), and that Aetna did not give the named insured sufficient notice of the availability of such coverage as required by section 627.727, Florida Statutes (1982 Supp.). Adams seeks to recover UM/UIM benefits up to the amount of the policy's bodily injury liability limits. Because disputed material issues of fact concerning the sufficiency of Mr. Adams's rejection of UM/UIM limits remain for resolution by the jury, we reverse the directed verdict and remand for a new trial.
In case number 88-1104, the Earl Bacon Insurance Agency, Inc. (Bacon), appeals a final judgment entered on a jury verdict awarding damages to Biff Adams on his claim that Bacon, the insurance agency selling the two policies of insurance to Mr. Adams, was negligent in respect to the professional advice and handling it gave Mr. Adams regarding availability and rejection of UM/UIM coverage. The jury found both Bacon and Mr. Adams guilty of negligence and assessed 46 percent of the fault against Bacon under the comparative negligence doctrine. Finding no error in the trial court's submission of the negligence issues to the jury, and no error in the methodology used to determine the amount of Adams's damages, we affirm the judgment against Bacon.

I.

The Issues
On May 7, 1983, Biff Adams was struck by an automobile while walking along the shoulder of a road in Panama City and received severe permanent injuries. He filed suit against the operator and the owner of the automobile involved and settled the claims for $50,000, the full amount available under their liability insurance coverage. It is undisputed that this amount is significantly less than the total damages suffered by Adams.
Biff Adams is an insured under two policies of automobile insurance issued to his father through the Bacon agency. Aetna policy number 10482358, issued as of November 1, 1978, and renewed annually thereafter, insures two motor vehicles and sets forth limits of coverage at $100,000 for bodily injury liability insurance and $10,000/$20,000 for UM/UIM insurance. Standard Fire's policy number 13569177, issued May 1, 1981, and renewed annually thereafter, insures Biff Adams's automobile and sets forth limits of $100,000 for bodily injury liability coverage and $10,000/$20,000 for UM/UIM coverage.
In the suit against Aetna, Biff Adams asserts a claim for UM/UIM coverage equal to the limits of the liability coverage under each policy. He contends that Mr. Adams, as named insured, never made an informed and knowing rejection or selection of UM/UIM limits lower than the liability limits in each policy. He further alleges that neither when the policies were first issued nor at the time of notification of annual renewal and billing for the premium due did Aetna provide Mr. Adams a meaningful opportunity to reject UM/UIM coverage equal to the liability coverage and to obtain UM/UIM limits higher than the $10,000/$20,000 limits shown on the face of the policies. At the conclusion of the trial, the court directed a verdict in Aetna's favor, relying primarily on Marchesano v. Nationwide Property and Casualty Ins. Co., 506 So.2d 410 (Fla. 1987). The court instructed the jury that "as a matter of law the court has found that Aetna mailed to Carl Adams [the named insured] and that Carl Adams received the brochures marked into evidence as Defendant's exhibits 4 and 5" prior to May 1, 1983. The brochures referred to are copies of notices of available UM/UIM coverage that Aetna contends it sent to Mr. Adams in April 1983 *1145 with the premium notices.[2] The court ruled that Mr. Adams did not request higher UM/UIM benefits after receiving three notices and thus waived his right to any increased coverage.
In the cause of action against the Earl Bacon Insurance Agency, Biff Adams contends that the personnel in Bacon's office placing the insurance for Mr. Adams failed to advise, inform, and handle the placement of the UM/UIM coverage in accordance with the standard of professional care normally expected of a reasonably prudent insurance agent, resulting in inadequate UM/UIM coverage. At trial, Biff Adams and Bacon stipulated that Adams's injuries caused damages exceeding $115,000, but did not fix the dollar amount of Adams's total damages. The jury returned a verdict finding both Mr. Adams and Bacon guilty of negligence and assessed comparative fault against each of them. Pursuant to the stipulation and the jury verdict, the trial court entered judgment against Bacon for $115,000, calculated by first determining that Adams should have had $300,000 UM coverage available by stacking the amounts of liability coverage in the two policies,[3] subtracting the $50,000 settlement recovered from the tortfeasor, and then multiplying the difference of $250,000 by the 46 percent negligence assessed against Bacon by the jury.

II.

The Adams Appeal, Case No. 88-19
We first address the directed verdict for Aetna. Bacon is an insurance agency authorized to sell Aetna insurance policies. Bacon prepared the applications for the policies for Mr. Adams, and both policies were issued with lower limits of $10,000/20,000 UM/UIM coverage in accordance with these applications. On the record in this case, we consider Bacon to be the agent of Aetna rather than Mr. Adams concerning Aetna's statutory obligation to obtain a proper rejection of statutorily-required UM/UIM coverage, and Aetna will be treated as bound by Bacon's knowledge and conduct in that regard. See Quirk v. Anthony, 563 So.2d 710 (Fla. 2d DCA 1990).
The record contains evidence tending to establish, with some dispute, the circumstances under which Mr. Adams obtained the initial issuance and delivery of the two liability insurance policies and the nature and sufficiency of Aetna's notices (brochures) dealing with the availability and rejection of UM/UIM coverage that Aetna contends were enclosed with the renewal premiums. The evidence, drawing inferences most favorably for Biff Adams, is sufficient to support findings of the following ultimate facts by a jury: Mr. Adams never knowingly rejected UM/UIM coverage in limits less than those required by statute, and never personally executed a valid written form or document indicating such rejection; UM/UIM insurance coverage was not discussed with Mr. Adams in 1978 when the Aetna policy was issued, or in 1981 when the Standard policy was issued, or at any other time thereafter; no UM/UIM rejection form was signed by Adams when the applications were filled out and signed; three weeks after applying for the policy in 1978, a blank UM form was sent to Mr. Adams, who signed and returned it without rejecting UM/UIM coverage or selecting any particular limits; there was no explanation of UM/UIM coverage with this form; and, in 1981 the application for the Standard policy and the accompanying UM/UIM form was prepared by personnel in Bacon's office who placed Mr. Adams's signature thereon without discussing the matter with Mr. Adams.
There is also considerable dispute in the evidence regarding whether Aetna actually sent out the notices or brochures describing available UM/UIM coverage with the renewal premiums in April 1983. Biff Adams argues that Mr. Adams was not *1146 properly informed and never made a knowing rejection of UM/UIM limits less than the bodily injury liability limit provided in the policy, and never signed a UM/UIM form indicating either rejection or selection of lower limits that would permit Aetna to issue the original policies with the reduced UM/UIM coverage.

A.

The Statutory Provision
The provisions in section 627.727, Florida Statutes (1982 Supp.), governed the renewal of the policies in November 1982 and May 1983, the last renewal dates for each policy immediately preceding the date of the accidental injuries to Adams. Aetna's statutory duty to provide UM/UIM coverage with limits equal to the policy's bodily injury liability coverage limits, unless negated by the named insured's written rejection of such coverage, is found in the following provisions of section 627.727:
(1) No motor vehicle liability insurance policy shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom. However, the coverage required under this section shall not be applicable when, or to the extent that, any insured named in the policy rejects the coverage in writing... . Unless the named insured, or lessee having the privilege of rejecting uninsured motorist coverage, requests such coverage in writing, the coverage need not be provided in or supplemental to any other policy which renews, extends, changes, supersedes, or replaces an existing policy issued to him by the same insurer, when the named insured or lessee had rejected the coverage in connection with a policy previously issued to him by the same insurer. Each insurer shall at least annually notify the named insured of his options as to coverage required by this section. Such notice shall be part of the notice of premium, shall provide for a means to allow the insured to request such coverage, and shall be given in a manner approved by the department... .
(2)(a) The limits of uninsured motorist coverage shall be not less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured; but in any event the insurer shall make available, at the written request of the insured, limits up to $100,000 each person and $300,000 each occurrence, irrespective of the limits of bodily injury liability purchased, in compliance with the rating plan of the company.
(b) In addition, the insurer shall make available, at the written request of the insured, excess underinsured motor vehicle coverage, providing coverage for an insured motor vehicle when the other person's liability insurer has provided limits of bodily injury liability for its insured which are less than the damages of the injured person purchasing such excess underinsured motor vehicle coverage. Such excess coverage shall provide the same coverage as the uninsured motor vehicle coverage provided in subsection (1), except that the excess coverage shall also be over and above, but shall not duplicate, the benefits available under the other person's liability coverage.
(Emphasis added).
The statute was amended, effective October 1, 1982, to require that the rejection of UM/UIM coverage specified in the statute be in writing. Ch. 82-243, § 544, 813 Laws of Florida. This added provision is not a mere technicality but a substantial statutory requirement designed to protect all insureds under the policy. Chmieloski v. National Union Fire Ins. Co., 563 So.2d 164 (Fla. 2d DCA 1990); Vasquez v. Bankers Ins. Co., 502 So.2d 894 (Fla. 1987). The provisions of section 627.727 reflect a "legislative intent to place a *1147 heavy duty upon insurers to obtain a knowing rejection of statutorily provided for uninsured motorist limits and to reflect a public policy in Florida to favor full uninsured motorist coverage for Florida residents, see also Hodges v. National Union Indemnity Co., 249 So.2d 679 (Fla. 1971), unless knowingly rejected by the insured." Nationwide Property & Cas. Ins. Co., 482 So.2d 422, 425 (Fla. 2d DCA 1985), approved, 506 So.2d 410 (Fla. 1987). See Kimbrell v. Great American Ins. Co., 420 So.2d 1086 (Fla. 1982). "If no informed selection of lower limits is made by the insured, the limits of coverage are merely tied to the limits of liability insurance. See American Fire & Indemnity Co. v. Spaulding, 442 So.2d 206, 208 (Fla. 1983)." Coleman v. Florida Insurance Guaranty Association, Inc., 517 So.2d 686, 688 (Fla. 1988). If there is no intentional rejection of the statutorily required coverage as specified by the statute, the applicable UM/UIM limits are equal to the liability limits unless the insurer can establish in some manner that the insured waived the statutory rights to UM/UIM coverage with limits equal to liability coverage. See Chmieloski v. National Union Fire Ins. Co., 563 So.2d 164 (Fla. 2d DCA 1990). "An informed rejection of additional uninsured motorist coverage cannot, without extrinsic evidence, be implied from the insured's signature on an application for uninsured motorist coverage to lower limits... ." American Motorists Ins. Co. v. Weingarten, 355 So.2d 821 (Fla. 1st DCA 1978); Zisook v. State Farm Mutual Automobile Ins. Co., 440 So.2d 452 (Fla. 3d DCA 1983). An insured can be bound to a rejection of uninsured motorists coverage evidenced by a document signed by the insured, thereby entitling the issuing insurance company to a directed verdict on the issue of whether the insured knowingly rejected the coverage. However, whether a named insured knowingly rejected or selected UM/UIM limits lower than required by statute is ordinarily an issue of fact for the jury in the absence of a signed rejection thereof. Kimbrell, 420 So.2d 1086; Vasquez, 502 So.2d at 895-96.
The cases construing and applying section 627.727 have made it clear that a knowing rejection of statutory UM/UIM limits cannot be implied from the fact that lower limits are stated in the application, and that the insurer's failure to obtain the statutorily required signed written rejection shifts the burden to the insurer to prove a waiver by the insured of such statutory rights. Quirk v. Anthony, 563 So.2d 710 (Fla. 2d DCA 1990) (once insured establishes no written rejection form exists, the burden of proof shifts to the insurance company to prove that the named insured waived the right to a written rejection by otherwise making a knowing rejection of the coverage required by statute. Id. at 715).

B.

Application of Section 627.727 in this case
The evidence in this case is sufficiently in dispute to allow the jury to determine whether Mr. Adams did or did not knowingly reject or waive UM/UIM limits equal to the liability limits when the policies were issued and when the renewal premiums were paid. Mr. Adams testified that UM/UIM coverage was never discussed with him by Bacon, and he gave Bacon no instructions as to the limits of UM/UIM coverage desired. The initial application for the Aetna policy in 1978 requesting $10,000/$20,000 UM coverage was not filled in by Mr. Adams, nor could he recall signing it. Although a blank form containing options for different UM/UIM coverage was sent to him by Bacon shortly thereafter, Mr. Adams signed and returned this form without rejecting or selecting any UM/UIM limits. The application for the Standard policy in 1981 was also completed by Bacon and was not signed or reviewed by Mr. Adams. The UM/UIM form dated one week later was not signed by Mr. Adams, bears no policy number, and the markings used to select the UM/UIM options on it were not in Mr. Adams's handwriting. It appears that Bacon's personnel entered the information *1148 and affixed Mr. Adams's signature where needed.
The evidence did not establish that Mr. Adams was sent or ever signed a written rejection of statutory UM/UIM limits as required by the amended statute after it became effective October 1, 1982.[4] As stated by the supreme court, "It is the general rule in Florida that upon each renewal of an insurance policy an entirely new and independent contract of insurance is created," and "an insurance policy is normally renewed upon the payment of a new premium." Marchesano, 506 So.2d at 413. Thus, when each of the policies were renewed after October 1, 1982, it became a new contract required to conform to the newly-amended law, and Aetna's obligations and Mr. Adams's correlative rights regarding statutorily-required UM/UIM coverage necessarily became an inherent part of the renewal policy.
It is also the general rule that, "Absent a notice to the contrary, the insured is entitled to assume that the terms of the renewed policy are the same as those of the original contract." Marchesano, 506 So.2d at 413. However, to comply with the new law as to each renewal policy after October 1, 1982, Aetna became obligated to do at least one of the following: (1) obtain signed written rejections that complied with the new statute, (2) withhold issuance or delivery of the policy until the written rejection was obtained,[5] or (3) issue the policy with statutorily-required UM/UIM limits equal to the liability limits. Aetna could avoid the statutorily-required UM/UIM limits in Mr. Adams's policies only by obtaining a valid written rejection conforming to the requirements of the statute at the next renewal of each policy following October 1, 1982, (at November 1, 1982, regarding the Aetna policy and at May 1, 1983, regarding the Standard policy). However, Aetna adduced no evidence to prove it even undertook to obtain validly signed written rejections or selections of lower limits from Mr. Adams. Instead, Aetna concentrated on proving only that it had sent appropriate notices of available UM/UIM coverage to Mr. Adams with the premium notices and that the forms so enclosed for requesting UM/UIM limits higher than those specified on the face of each original policy were not returned by Mr. Adams. Without obtaining written rejections in compliance with the newly-amended section 627.727, Aetna was unquestionably obligated by law to be liable for UM/UIM limits equal to the liability limits, unless Mr. Adams, by reason of his conduct, had otherwise waived these rights under the statute.
It is undisputed that Mr. Adams failed to respond to the brochures Aetna claims to have mailed in April, about three weeks prior to the May 7, 1983, accident, and did not promptly request higher limits of UM/UIM coverage than shown on the face of the old policy. His failure to react to Aetna's offer, however, does not necessarily prove, as a matter of law, that Mr. Adams waived his rights to the statutorily-mandated UM/UIM coverage. Aetna's brochures (Defendants' exhibits 4 and 5) did not inform Mr. Adams of Aetna's statutory obligation either to obtain a written rejection of statutorily mandated UM/UIM coverage or to renew the policy with UM/UIM limits coextensive with the liability limits. Nor did the brochures inform Mr. Adams that the policy would have to be amended to increase his UM/UIM limits to the limits of his liability coverage if Aetna had no written rejection. Nothing stated in either brochure directed Mr. Adams to sign and return a rejection form if he did not want UM/UIM limits in amounts equal to liability limits as required by the amended statute. Instead, the notices only advised Mr. Adams that he could choose to change *1149 his UM/UIM limits if he so desired. The notices contained a brief explanation of the differences between UM and UIM coverage, and then cautioned,
This is not a complete explanation of the Uninsured Motorists Coverage. For a more detailed explanation of the coverage, contact your agent. Your agent will be happy to provide the professional advice you need in choosing the option that's best for you.
The notices also specifically directed in italicized language: "Do not complete or return the form unless you wish to change your Uninsured Motorists Coverage." Obviously, this directive was not intended to obtain the written rejection required by the newly amended statute to permit the insurer to issue the renewal policy with UM/UIM coverage limits less than the liability coverage. Even assuming that these brochures were timely received by Mr. Adams, they could not alert him that the UM limits stated in his original policy would mandatorily increase by virtue of a new statutory provision unless he signed and returned a written rejection of such limits. A jury could reasonably find, therefore, that Aetna never informed Mr. Adams of his new statutory right as required by the statute. Yet, knowledge of a right is an essential prerequisite to establishing that one has waived it. Gulf Life Ins. Co. v. Green, 80 So.2d 321, 322 (Fla. 1955) ("There can be no waiver without knowledge express or implied of that which is to be waived.").
The 1982 amendment requiring written rejection of UM coverage was undoubtedly prompted by the difficulty under the prior law of proving a "knowing" waiver of UM/UIM coverage, and also by the insured public's apparent lack of understanding of the concepts and scope of uninsured and underinsured motorist coverage. Determining that UM/UIM and liability coverage in coextensive limits is a desirable public policy, the legislature set about curing these problems by mandating the issuance and delivery of automobile liability insurance policies with such coverage in every instance unless an insured should be informed of this statutory requirement and reject the required UM/UIM coverage in writing. As the court explained in Quirk:
First, the nature and extent of the 1982 and 1984 amendments make it apparent that the legislature is attempting to avoid litigation over a "knowing" rejection by placing far greater emphasis and importance upon the written rejection as a self-proving document. Second, the written rejection should make the insurance carrier's task much easier. If the underwriting file contains a signed rejection, a policy can be issued without UM. If the insured fails to sign and submit a rejection form, the carrier simply can refuse to issue a policy without UM. Given the relative simplicity of this system, the insurance carrier should not be encouraged by the courts to disregard the written rejection as a technicality.

563 So.2d 710, 714 (emphasis added).
This new element added in 1982 to the statutory scheme greatly simplified the process for insurers and insureds by fixing their respective rights and obligations with reasonable certainty because both parties presumably would now know that, regardless of the facial limits of UM in the policy, the UM/UIM policy limits would be deemed by law to be coextensive with bodily injury liability limits in the absence of a written rejection signed by the insured.
In arguing the waiver issue, Aetna argues that, regarding the "propriety of the granting of a directed verdict as to the annual notification issue alone, any reference to initial insurance purchases and Mr. Adams's background is irrelevant," and therefore Aetna's brief "will address only the facts which were developed at trial with regard to the annual notification issue and the presumptive mailing issue, upon which the directed verdict was granted." (Answer Brief, p. 3). While we do not agree with Aetna that the evidence of the parties' prior dealings and conduct surrounding the issuance of the policies is irrelevant to the issue before us, we construe these statements as meaning that Aetna does not dispute, at least for purposes of this appeal, that the evidence before *1150 the trial court was sufficient to support a jury finding that Mr. Adams neither knowingly selected any particular limits of UM/UIM coverage nor rejected UM/UIM coverage with limits equal to his liability limits when the policies were issued, and also that he never personally executed a rejection of UM/UIM limits in amounts less than the liability limits at any time thereafter. In any event, we conclude that the jury could have so found on this record. Therefore, it was error to grant Aetna a directed verdict on this issue. See Riggsby v. West American Ins. Co., 505 So.2d 1364 (Fla. 1st DCA 1987).

C.

The Marchesano Decision
This brings us to the trial court's reliance on the supreme court's decision in Marchesano as authority for directing a verdict for Aetna. Significant factual and procedural differences between Marchesano and the instant case make its holding inapplicable here.

1.
In the first place, it was undisputed in Marchesano that when the original policy was purchased the named insured personally elected UM limits of $10,000/$20,000 and signed a form stating that he knew he could purchase limits of uninsured motorist coverage equal to the insured's bodily injury liability limits.[6] This undisputed fact established the necessary predicate that the named insured personally selected the limits set out in the original policy and was manifestly relevant to the ultimate result in the case. As the Second District explained in its opinion:
Accordingly, after an insured's uninsured motorist coverage has been in force for a period of time the insurer who sold the coverage under circumstances like those in this case may in this manner be relieved of its inability to absolutely defeat an insured's disavowal of his rejection of uninsured motorist coverage limits which was made at the time the insurance was purchased. This is surely not unfair to insureds, such as the insured in this case, who at the time of their receipt of the statutorily required notification could no longer be heard to say that they are confronted with a subject new and unknown to them.
Nationwide Property and Casualty Ins. Co. v. Marchesano, 482 So.2d 422, 427 (Fla. 2d DCA 1985), approved 506 So.2d 410 (Fla. 1987). The supreme court's decision also is predicated on this essential fact. There is, however, some confusing language in the supreme court's Marchesano opinion that undoubtedly misled the court below. After having discussed this essential fact, the last two paragraphs of the supreme court's opinion depart from the existing facts then before the court and hypothesize about "an insurance company's failure to obtain a written rejection at the time the original policy is procured... ." (506 So.2d at 413). In so doing, the court appears to fashion a broad rule to be applied not only in the factual circumstances of the dispute then before it but to future disputes involving significantly differing factual circumstances as well.[7] As a result, *1151 the court's language would seem to allow an insurer having failed to obtain a valid written rejection of UM/UIM coverage to issue and deliver a liability policy with reduced UM/UIM coverage in clear violation of the statute and then avoid the statutorily-mandated consequences of this wrongful act through the expedient of mailing out notices or brochures merely offering the statutorily-required UM/UIM coverage and implying a rejection or waiver thereof from the insured's failure to respond to such offer. The court's decision in Marchesano was undoubtedly a sound one on the facts before it and completely in accord with the statutory scheme and purpose clearly evidenced by the 1982 amendment to section 627.727. But to accord to that decision a broader ruling as described above and apply that ruling to the facts of the instant case would produce a result directly counter to the statutory scheme and purpose. This is easily demonstrated.
Section 627.727 makes it unlawful for an insurance company to issue or deliver a motor vehicle policy without the UM/UIM coverage as specified in that section;[8] however, "the coverage required under this section shall not be applicable when, or to the extent that, any insured named in the policy rejects the coverage in writing" (emphasis added). The section then makes provision for what must be done in respect to renewal of such policies in the following language:
Unless the named insured ... requests such coverage in writing, the coverage need not be provided in or supplemental to any other policy which renews ... an existing policy issued to him by the same insurer, when the named insured ... had rejected the coverage in connection with a policy previously issued to him by the same insurer. Each insurer shall at least annually notify the named insured of his options as to coverage required by this section. Such notice shall be part of the notice of premium, shall provide for a means to allow the insured to request such coverage, and shall be given in a manner approved by the department.
Section 627.727(1). The obvious purpose of these statutory provisions is to preclude an insurance company from issuing or delivering a policy with less than the statutorily-required UM/UIM limits specified in subparagraph (2) of that section, without having the insured's signed written rejection in the insurance company's file. However, when an original policy is issued and delivered with UM/UIM limits less than required in subparagraph (2) because the named insured had rejected or selected lesser UM/UIM coverage in writing, the renewal policies need not provide the statutorily mandated coverage unless requested by the insured. In these circumstances, the insurance company is only required to "notify the named insured of his options as to coverage required by this section" at least annually with the notice of premium. We agree with the court in Quirk that this written rejection requirement is simplistic in its operation and that insurers should not be encouraged by the courts to disregard it.
Applying this simple statutory scheme to the actual facts in the Marchesano case leads very quickly to the result reached by the second district and the supreme court. Nationwide had obtained Marchesano's written rejection of statutorily-mandated coverage and in obvious reliance thereon had issued the original policy with the UM limits so selected by Marchesano. Thus, the issuance and delivery of the original policy with the lower limits was valid because Nationwide had this written rejection in its files. The only statutory duty then remaining on Nationwide was to adequately inform the Marchesanos at least once a year of the available higher UM/UIM limits. Having validly issued the policy in compliance with the statute, Nationwide *1152 was authorized by the statute to continue the UM/UIM coverage at the original policy limits upon each renewal thereof so long as it provided to the Marchesanos the required UM/UIM information with the premium renewal notices and the Marchesanos did not request an increase from the original policy limits they had originally selected. The jury having specifically found that, in full compliance with the statute, "Nationwide notified the Marchesanos between April 26, 1983, and February 1984, as part of their notice of premium, of their uninsured motorist coverage options in a manner that provided a means for the Marchesanos to request such coverage and on a form approved by the Department of Insurance," 506 So.2d at 413, Nationwide thus had fulfilled its only remaining statutory obligations to the Marchesanos. The Marchesanos' failure to request higher UM limits pursuant to the stated options constituted an implied waiver of their rights to receive a renewal policy with the statutorily-required UM/UIM coverage, that is, amounts greater than selected in the original policy.
Although the jury specifically found that Marchesano did not "knowingly" reject the higher UM/UIM limits under the principle of the decision in Kimbrell, that finding did not mean that Marchesano had not personally selected the limits reflected in the original policy without knowing that he could obtain higher limits. It only established that Marchesano did not have sufficient understanding of UM/UIM coverage at that time to make an informed or knowing rejection of the higher coverage required by the statute. The court's holding that in these circumstances Marchesano waived his right to insist on the statutorily-required UM/UIM coverage, notwithstanding that his original "unknowing" selection of lower UM/UIM limits could not be retroactively cured by the periodic notice, is perfectly logical and consistent with the plain language of the amended statute.
Manifestly, the waiver issue presented to the court in Marchesano is not the same as the waiver issue presented in the case now before us. The evidence in the instant case would permit the jury to find that Mr. Adams had never selected UM/UIM coverage in any amount, much less rejected limits less than statutorily required, in writing or otherwise, and that the UM/UIM coverage set forth in both original policies were selected by Aetna's agent, Bacon, without even discussing the matter with Mr. Adams. Thus, unlike Nationwide's conduct in the Marchesano case, Aetna unlawfully issued and delivered the original policies in this case in direct violation of the statutory provisions in section 627.727. As a result, in spite of the lower UM/UIM limits reflected on the face of each policy, each original policy was required by operation of law to afford Mr. Adams UM/UIM coverage coextensive with the limits of liability coverage. Therefore, accepting the evidence most favorably to Adams's contentions, Aetna was never entitled to rely on the written applications or the other UM/UIM documents signed by Bacon in issuing and delivering the original policies as a valid reason for not providing the statutorily required coverage. The original policy UM/UIM limits were simply void ab initio, and Aetna was at all times obligated to provide the statutorily-required coverage under those policies. Aetna was not authorized by any of the provisions in section 627.727 to thereafter cure the error in its original policies and effect a change in the policy limits simply by mailing out the brochures previously described advising Mr. Adams of available options for increased UM/UIM coverage and relying on his failure to respond.[9]
Mr. Adams's failure to respond to the options provided in the brochures did not constitute, as a matter of law, a waiver of his statutory rights. To prevail on its defense of waiver in this case, Aetna must prove not only that it sent the brochures to *1153 Mr. Adams in 1983, as it contends, but also that prior thereto Mr. Adams somehow gained actual knowledge of his statutory rights under section 627.727 and Aetna's failure to issue the policies in accordance with those statutory requirements, and that thereafter Mr. Adams waived his statutory rights. To imply waiver, based on Mr. Adams's failure to respond to the brochures alone and the inference therefrom that he had the requisite knowledge of his statutory rights and the coverage afforded thereunder by the statute, would defy logic and reason and accord to Aetna a procedure for correcting its initial statutory violation that is nowhere provided in the language of section 627.727, as amended.
Undoubtedly, the trial court gave literal effect to the last two paragraphs of the Marchesano opinion hypothesizing on the absence of a written rejection when it granted Aetna a directed verdict upon the finding as a matter of law that Aetna had sent the two brochures with the annual premium notices in full compliance with the statute. While our initial reaction to that opinion was somewhat similar to the trial court's, on closer examination and analysis of the Marchesano decision and the purpose and public policy manifested in section 627.727, as amended, it became clear that to apply the statute to the facts that could be found by the jury in the instant case and find waiver as a matter of law would completely emasculate the obvious statutory scheme; it would authorize an insurance company guilty of unlawfully issuing policies in direct violation of the statute to avoid the consequences dictated by the statutory language through the simple expedient of mailing out brochures such as those purportedly sent to Mr. Adams. To give this effect to the statute would be to simply revert to the law and practice as it existed before section 627.727 was initially enacted and essentially bind an insured to the facial limits of a policy delivered to and accepted by an insured without objection to the stated UM limits. Section 627.727 was enacted to avoid the effect of this practice by shifting the burden of compliance with statutory requirements to the insurer. To uphold waiver as a matter in law in this case would prompt the very evil sought to be cured by the amended legislative requirement of a valid written rejection of statutorily required UM/UIM coverage.
Accordingly, we do not believe that the supreme court's decision in Marchesano compels affirmance on this appeal. The court's opinion does not indicate that Marchesano's written rejection of UM limits and selection of lower limits was not material to the result in the case. It is elementary that the holding in an appellate decision is limited to the actual facts recited in the opinion, so the supreme court's statements hypothesizing about the absence of a written rejection, being contrary to the actual facts in this case, are pure dictum.[10] Moreover, it is not clear from the court's opinion that it even considered the arguments made in this case; the opinion does not set forth an analysis of the various provisions in section 627.727, as amended, and explain the interplay of the statutory language regarding the need for and legal effect of not having a written rejection, as we have done in this opinion.

2.
In the second place, in Marchesano the trial court submitted to the jury the question of whether Nationwide's uninsured motorist notice to the Marchesanos fully complied with all the requirements of section 627.727, and the jury found that it did. *1154 In the instant case there is conflicting evidence as to (1) whether the language of the notices sent by Aetna was sufficient to give adequate notice under the terms of the statute, and (2) whether Aetna actually sent such notice to Mr. Adams as well. The jury could have found that Aetna did not give Mr. Adams any notice of the statutory right to coextensive liability and UM/UIM coverage without a written rejection in order that Mr. Adams's knowledge thereof could support a waiver of that right. Likewise, there is a disputed question of fact as to which notice (Aetna brochure 4041 or 4047) was actually sent to Mr. Adams, or whether either was actually sent to him by Aetna. These were apparently Aetna's first notices that purported to adequately describe "underinsured" motorists coverage. The evidence could also be construed as showing that only a handwritten log was kept by Aetna to indicate when a UM/UIM brochure was mailed with the premium notice, and that no log entries were made regarding brochure 4047. There was also evidence that when one of the new brochures was to be included with a bill in the special notification procedure, a message would be printed on the premium notice that an explanation of UM benefits was included, but such notation appeared only on Mr. Adams's premium notices for the annual renewal of the Aetna policy at November 1, 1982, well before the two brochures described above were printed and approved by the Department of Insurance. In short, Aetna's proof of routine practice as the predicate for inferring that one or the other brochure had been sent to Mr. Adams and adequately informed him of his statutory rights is not conclusive by any means and does not support a finding on this issue as a matter of law. In Marchesano the issue of notification was decided by the jury, and that issue should have been submitted to the jury in this case also.
For the foregoing reasons, we conclude that the Marchesano decision is materially distinguishable and is not controlling on the issues presented on the facts and circumstances in the instant case.[11]

D.

Adams's Request for Directed Verdict
Adams argues as an additional point on appeal that he is entitled to a directed verdict against Aetna because the evidence establishes without material dispute that Aetna did not at any time afford Mr. Adams sufficient knowledge of UM/UIM coverage for him to reject or select lower limits than required by the statute. We do not agree. As we have stated previously, there is considerable dispute in the record over nearly all material factual issues. We conclude that a jury should try the case against Aetna and decide the issues based on appropriate instructions as to the law. We are not prepared to say as a matter of law that a jury could not find for Aetna based on the disputed facts.
Accordingly, the directed verdict against Adams and in favor of Aetna is reversed and this cause is remanded for trial by jury on the disputed issues of fact.

III.

Bacon's Appeal, Case No. 88-1104
On its appeal from the judgment entered on the jury verdict for Adams, Bacon makes three points, none of which warrants reversal of that judgment. We deal briefly with each point in order.

A.

Aetna's Compliance with Section 627.727 Exonerates Bacon
Bacon's first point is that the trial court erred in denying its motions for summary judgment and directed verdict because Aetna had fully complied with the requirements of section 627.727. Bacon argues it *1155 presented evidence that Mr. Adams had affixed his signature to at least four uninsured motorists selection forms and that this fact conclusively demonstrates a knowing selection of UM limits both as to it, as agent, and as to Aetna, the insurer. Bacon further argues that Aetna's compliance with the annual notification requirements of section 627.727, as evidenced by the directed verdict for Aetna, relieves Bacon as Aetna's agent of responsibility to convey identical information to the insured, Mr. Adams. We are not persuaded by these arguments for several reasons.
We begin with the principle of law underlying the claim against Bacon. It is settled law that an insurance agent "is required to use reasonable skill and diligence, and liability may result from a negligent failure to obtain coverage which is specifically requested or clearly warranted by the insured's expressed needs." Warehouse Foods, Inc. v. Corporate Risk Management Services, Inc., 530 So.2d 422 (Fla. 1st DCA 1988). This general duty requires the agent to exercise due care in correctly advising the insured of the existence and availability of particular insurance, including the availability and desirability of obtaining higher limits, depending on the scope of the agents undertaking. Seascape of Hickory Point Condominium Association v. Associated Insurances Services, Inc., 443 So.2d 488 (Fla. 2d DCA 1984); Woodham v. Moore, 428 So.2d 280 (Fla. 4th DCA 1983); Sheridan v. Greenberg, 391 So.2d 234 (Fla. 3d DCA 1981). The trial court correctly determined that Bacon was under a duty of care to Mr. Adams in this case based on the evidence of their relationship and the scope of Bacon's undertaking.
Bacon's duty to Mr. Adams to exercise due care in giving professional advice about insurance coverage is broader than Aetna's statutory duty to give its insured notice of available UN/UIM coverage. Since the two duties are not coextensive in scope, Aetna's compliance with the statutory duty may or may not operate to discharge Bacon's duty, depending on the circumstances. Whether it does or not in a given case will depend on what material facts are found. Any dispute as to these material facts will, of course, foreclose granting either a summary judgment or a directed verdict.
Bacon's contention that it conclusively proved Mr. Adams had full and complete knowledge of UM/UIM coverage by reason of placing his signature on four forms rejecting or selecting UM/UIM coverage must fail for at least two reasons. First, the forms referred to did not specifically relate to the renewal policies under consideration. There is considerable dispute as to whether the forms were in fact completely filled out by Mr. Adams, although he admitted his signature appeared thereon. Secondly, the fact that he signed these forms does not necessarily prove conclusively that Mr. Adams had a full understanding and appreciation of the scope and purpose of UM/UIM coverage. While this evidence is appropriately considered by the trier of fact along with all the other evidence of Mr. Adams's knowledge, it is insufficient to support a ruling for Bacon as a matter of law.
Bacon's argument that Aetna's compliance with the notice provisions of section 627.727 warrants a decision in Bacon's favor as a matter of law is also without merit. In the first place, we have reversed the trial court's directed verdict for Aetna and remanded for a trial on the issue of waiver and notice, so that ruling no longer affords any basis for a ruling as a matter of law on Bacon's motions. Even if the jury, on retrial, should exonerate Aetna based on the waiver defense, however, that would not also necessarily operate to exonerate Bacon from liability for its negligent advise and counsel to Mr. Adams. Even if Mr. Adams were found to have intentionally selected lower UM/UIM limits than those presumptively afforded by the statute and waived his rights against Aetna, that selection could have resulted because Bacon negligently failed to perform its duty to competently advise Mr. Adams of appropriate limits and the need for such coverage, as alleged by the plaintiff. In such circumstances, Bacon could be held liable to Adams while Aetna might not be.
*1156 Marchesano and Vasquez are inapposite to this point because factually distinguishable. Each involved completely different issues and neither requires a reversal of the trial court's rulings on Bacon's motions on the facts of this case.

B.

Bacon Owed No Duty
Bacon's second point contends that as an insurance agent it owes no duty to an insured to define policy terms, explain various factual scenarios in which coverages might apply, or suggest limits of coverage. We cannot agree, however, that the argument and the authorities discussed by Bacon require a judgment for it as a matter of law. Whether Bacon as an agent was under a duty to perform the described functions with the due care required of a professional depends on the proof of Bacon's undertaking and its relationship with Mr. Adams. See Warehouse Foods, Inc., 530 So.2d 422; Glades Oil Co. v. R.A.I. Management, Inc., 510 So.2d 1193 (Fla. 4th DCA 1987); Seascape of Hickory Point Condominium Association, 443 So.2d 488. These are disputed factual matters on this record, and we cannot say the trial court erred in submitting such issues to the jury.

C.

The Calculation of Damages
Bacon's last point contends that the trial court erred in refusing to deduct the insured's comparative negligence from the amount of insurance the insured would have purchased but for the combined negligence of the insured and the agent. Bacon argues that damages should have been determined in the following manner: Accepting the propriety of stacking the policies, the total amount of UM/UIM coverage that would have been available was $300,000; because the jury assessed Mr. Adams with 54% comparative negligence, the $300,000 should be reduced by that factor to $138,000, and this figure treated as the total policy limits that would have been available to Mr. Adams; since $50,000 was recovered from the actual tortfeasors and is required to be set off against the UM coverage pursuant to section 627.727, Bacon's liability should be reduced to $88,000.
The trial court, of course, did not accept this calculation, but treated the $300,000 as the total coverage that should have been available, subtracted the $50,000 recovery from the tortfeasors, and concluded that $250,000 would be the available coverage for purposes of damages. The court then applied the 46% negligence factor assigned by the jury to Bacon and concluded the appropriate damages were $115,000.
Neither party cites any case even closely on point. Both parties agree that the measure of damages is that which is necessary to restore the injured party to the position he would have been in had the wrong not been committed. Glades Oil Co. v. R.A.I. Management, Inc., 510 So.2d 1193. Under this standard, we find no error in the court's approach to computing damages. We cannot agree with Bacon that Mr. Adams's 54% negligence should be applied to determine the amount of coverage that would have been purchased but for Bacon's alleged negligence. We agree with the trial court that the probable coverage should be determined first ($300,000), then subtract out the recovery from the tortfeasor ($50,000), and finally apply the percentage negligence factor to the resulting figure ($250,000) to reduce the otherwise recoverable damages by reason of the insured's negligence ($115,000).
To summarize, the final judgment on the directed verdict for Aetna is reversed and the issues in that cause of action are remanded for a new trial. The judgment against Bacon is without error and is affirmed.
REVERSED IN PART; AFFIRMED IN PART.
SMITH and BARFIELD, JJ., concur.
NOTES
[1] We refer to these defendants collectively. Standard Fire and Aetna are related insurers, and the evidence with respect to both was substantially similar.
[2] Defendants' exhibit 4 is Aetna brochure number 4041, dated December 1982. Defendants' exhibit 5 is Aetna brochure number 4047, dated January 1983.
[3] No issue regarding stacking is raised on this appeal.
[4] Until the 1982 amendment became effective, there had been no statutory requirement that an insurer obtain a written rejection of the statutory limits of UM/UIM, although many insurers had apparently followed the practice of doing so.
[5] The use of the word "delivered" in conjunction with the word "issued" in section 627.727(1) is no meaningless redundancy. A policy of insurance ordinarily must be delivered to the insured to become binding; thus, an insurer issuing a policy with incorrect coverage may withhold delivery to avoid its becoming effective.
[6] The supreme court's opinion explicitly noted: "Marchesano signed an acknowledgment stating that `Uninsured Motorist Coverage has been explained to me and I understand I can purchase up to 100,000/300,000 limits.' This language immediately preceded `I wish Uninsured Motorist Coverage with limits of $10,000/20,000 bodily injury.'" 506 So.2d at 412.
[7] The court's opinion states:

On the other hand, by including the uninsured motorist notice as part of the premium notice, Nationwide fulfilled its duty of informing the Marchesanos of the available coverage and offering that added coverage as part of the new insurance contract. Although such periodic notice will not act retroactively to cure an insurance company's failure to obtain a written rejection at the time the original policy is procured, when the insurance contract is renewed an insured has the responsibility to consider the information supplied to him with the premium notice. Once Nationwide fulfilled its statutory duty it could not reasonably be expected to do more. The Marchesanos must now take responsibility for their own failure to read and respond to the enclosed notices.
Accordingly, we rule that where the insurance company complies with the annual notice provision of section 627.727(1) the insured's failure to act upon that notice at the time of renewal constitutes an affirmative waiver of uninsured motorist coverage limits higher than those specified in the purchased policy.
506 So.2d at 413 (emphasis added).
[8] Section 627.727(1) specifically reads: "No motor vehicle liability insurance policy shall be delivered or issued for delivery in this state ... unless uninsured motor vehicle coverage is provided therein or supplemental thereto... ."
[9] This interpretation of the operation of section 627.727 in 1983 is strongly reinforced by the underlying purpose of the 1984 amendment to that section providing that if a written rejection on a form having the content stipulated by statute is signed by the named insured, "it will be conclusively presumed that there was an informed, knowing rejection of coverage or election of lower limits." Ch. 84-41, § 1, Laws of Fla.
[10] The holding or ratio decidendi of a decision is appropriately defined as the outcome of the case on the precise points discussed in the opinion stated in terms of the facts found to be material to the court's decision. All other statements in the opinion, even though necessary to explain the reasoning or rationale by which the court reached its result are obiter dictum and are not considered controlling precedent under the doctrine of stare decisis. See Goodhart, "Determining the Ratio Decidendi Of A Case," 40 Yale L.J. 161 (1930); Cohen, How to Find the Law, pp. 7-11 (West Pub. Co. 1976). Thus, it is clearly appropriate to determine the holding of a decision by reference to the salient facts discussed in the analysis but ignored in the court's justification of its result. Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1117 (Fla. 1984) ("the issue which the court posed for itself was hypothetical and its answer dicta. However, its decision was correct ...").
[11] We are unable to determine whether the decisions of the second district in Landi v. Nationwide Mututal Fire Ins. Co., 529 So.2d 1170 (Fla. 2d DCA) rev. denied, 537 So.2d 569 (Fla. 1988), and State Farm Mutual Automobile Ins. Co. v. Heppelle, 528 So.2d 505 (Fla. 2d DCA 1988), are in conflict with this decision due to the absence of a description of the material facts in each case showing that the insured's selection of UM/UIM coverage occurred under the same circumstances that the jury could find in this case.